# **<u>EXHIBIT 1</u>**

UNITED STATES DISTRICT COURT                    <u>FOR ONLINE PUBLICATION ONLY</u>
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

FRANKLIN OCAMPO, also known as
"Danny Gomez,"                                                    MEMORANDUM
                                                                   <u>AND ORDER</u>
                          Petitioner,                              99-CV-6727 (JG)

            - against -

UNITED STATES OF AMERICA,

                          Respondent.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

A P P E A R A N C E S :

            DANNY GOMEZ
                 # 45871-053
                 FCI Schuylkill - Unit 2B
                 P.O. Box 759
                 Minersville, PA 17954
                 Petitioner <u>Pro Se</u>

            ROSLYNN R. MAUSKOPF
                 United States Attorney
                 Eastern District of New York
                 1 Pierrepont Plaza
                 Brooklyn, New York 11201
            By:  KELLY A. MOORE
                 Assistant United States Attorney
                 Attorney for Respondent

JOHN GLEESON, United States District Judge:

            Franklin Ocampo, also known as (and referred to herein as) "Danny Gomez,"

moves pursuant to 28 U.S.C. § 2255 to vacate his sentence of life in prison, imposed upon him

after a jury found him guilty of, <u>inter alia</u>, drug trafficking and a hostage-taking in which the 17

year-old victim was brutally murdered. For the reasons set forth below, I reject all of the

arguments in Gomez's motion except for two, as to which an evidentiary hearing will be held on

April 9, 2004 at 11:00 a.m.

## BACKGROUND

A.   The Facts

On July 19, 1995, James Barona, a confidential informant, advised Detective Billy

Ralat that Barona's friends Emilio and Jerry had received threats. Barona told Ralat that

"Gandhi," "Runi" and others had confronted Emilio and Jerry at their apartment and accused them

of stealing $350,000 in money orders from a "stash" location controlled by "Gandhi." The woman

who had been watching that location at the time of the theft was unable to identify Emilio and Jerry

as the thieves, so they were released. However, shortly thereafter, a note was placed under

Emilio and Jerry's door, directing them to contact beeper number (971) 752-1106. Emilio, Jerry

and Barona paged the beeper number. They spoke with "Runi" and "Jose," and were informed that

their associate "Papitas" had been kidnapped and that a second individual had already been killed.

"Jose" warned that the stolen money orders must be returned if they did not want "Papitas" killed.

After hearing Barona's account, Detective Ralat made inquiries into recent

homicides of unidentified males. He learned that five days earlier, on July 14, 1995, on a service

road adjacent to the Grand Central Parkway in Queens, New York, the police found the dead body

of 17-year-old Carlos Alberto Osorio stuffed inside in a black suitcase. An onion had been placed

in his mouth, his face had been wrapped in duct tape, and his legs and arms had been bound. The

cause of death was strangulation, but the body bore the marks of torture: there were blunt impact

injuries on the forehead, and there was a 4-inch stab wound on one thigh. Ralat showed a photo of

Osorio to Barona, who confirmed that Osorio was "Papitas," the kidnapped associate of Emilio

and Jerry. At Ralat's direction, Barona again paged (917) 752-1106, which was the dead man's pager. Posing as the "sponsor" of Emilio and Jerry, Barona engaged the kidnappers in tape-recorded conversations relating to Osorio's torture and death and the provision of cocaine as restitution for the stolen money orders.

In the first of two conversations recorded on the evening of July 19, 1995, Gomez identified himself as "Jose." He related how Osorio had "snitched out" Emilio and Jerry regarding the stolen money orders. Barona said Emilio and Jerry were not involved in the theft. Gomez told Barona to have Emilio and Jerry consider returning the stolen money.

In the second conversation, Gomez identified himself as "Gandhi." During this call, Gomez described how the woman overseeing the stash location was brought to Emilio and Jerry's residence, but she could not identify them. However, she did identify Osorio, who was seized. Gomez said that Osorio was originally treated well, but then he was tortured. Osorio named Emilio and Jerry as the other thieves. Gomez also said a woman believed to be Emilio's mother was kidnapped and was being held in Colombia.

The following day, July 20, 1995, other telephone calls were recorded. In one call, Barona talked with "Gandhi" (Gomez) and "Gigo" (Jamie Londono Garcia, referred to herein as "Londono"). Gomez claimed the stolen money orders belonged to him, and that he would accept cocaine in lieu of them. Londono concluded that discussion, and in another call later that evening, Barona and Londono agreed that five kilograms of cocaine would be delivered by Barona as a down payment on the $350,000 owed as a result of the stolen money orders.

Londono, who testified for the government pursuant to a cooperation agreement, admitted that he was involved in the charged drug conspiracy and testified that he had engaged in a series of kidnappings and extortions for drug dealers in 1993 and 1994. He had met Gomez, whom

3

he knew only as "Gandhi," several months earlier. On July 20, 1995, Gomez related the Osorio

incident to Londono in detail. Gomez said that $350,000 had been stolen from him, that he and

"Runi" had brought the two men and a woman overseeing the location from which the money was

stolen to Jerry and Emilio's residence, and that the woman could not identify them as the thieves.

However, Gomez told Londono, Osorio was later identified as one of the thieves and kidnapped.

After being tortured, Gomez stated, Osorio confessed that Jerry, Emilio and "Costeno" had

committed the robbery; Osorio was then strangled to death and "Runi" was paid $25,000 for the

murder. Gomez hired Londono to kidnap Emilio and Jerry, gave him a $4,000 advance, and

exchanged beeper numbers with him. Londono still had Gomez's beeper number in his possession

when he was arrested on July 20, 1995.

In his testimony at trial, Londono also explained portions of the recorded telephone

conversations on July 20, 1995, that corroborated Barona's testimony. He identified "Gandhi's"

voice on the tapes as the voice of Gomez. The voice identification was buttressed by comparison

of the tapes to Gomez's voice on other taped conversations,[1] including several calls from a

wiretap in a separate federal investigation in Tennessee during the period from July 14, 1995 to

July 17, 1995. Londono also identified the voice of "Runi" on some of the Tennessee tapes.

"Runi" was arrested in Memphis on July 17, 1995, with Gomez's pager number in his possession.

The Tennessee calls corroborated Londono's account of what Gomez had told him

about the torture and killing of Osorio. In one conversation, "Canoso" described how he gave an

"ass-kicking" to someone to make him "sing;" and that he "turned his [Osorio's] face into shit."

---

[1]    In addition to Londono's identification of "Gandhi's" voice as that of Gomez, several other
Spanish-speaking witnesses made similar identifications, including Patricia Michelson, a court certified Spanish
language interpreter, and Detective Ralat.

4

(Gov't Ex. 55 at 3.)  In another call, Gomez described how the kidnapped person (who the context made clear was Osorio) "spit out Emilio, Jerry and Costeno at us."  (Gov't Ex. 61 at 8.)

Gomez was arrested on August 24, 1995.  In a post-arrest statement, he admitted that one of his nicknames was "Gandhi" and that he had a friend named "Runi."

B.    The Procedural History

Gomez was charged with conspiracy to possess with intent to distribute five kilograms of cocaine, in violation of 21 U.S.C. § 846 (Count One); hostage taking, which resulted in Osorio's death, in violation of 18 U.S.C. §§ 1203(a) (Count Two); hostage-taking of Jane Doe (a person believed to be Emilio's mother), in violation of 18 U.S.C. § 1203(a) (Count Three); and illegal re-entry after deportation, in violation of 8 U.S.C. § 1326(a) (Count Four). The jury convicted Gomez on all four counts.  He was sentenced to a term of life imprisonment on September 6, 1996.

Gomez was represented by new counsel for his appeal.  Appellate counsel filed a brief pursuant to Anders v. California, 386 U.S. 738 (1967).  The brief identified and discussed several potential issues for review before concluding that there were no nonfrivolous points to be raised on appeal.  The potential issues were: (1) jury tampering (i.e., an inadvertent entry of a nonjuror into the jury room); (2) improper admission of hearsay; (3) insufficiency of the evidence; and (4) incompetence of trial counsel.  In pro se briefs, Gomez raised additional claims: (5) prosecutorial misconduct in the government's rebuttal summation; (6) improper testimony from James Barona interpreting taped conversations; (7) outrageous government conduct in creating a crime; (8) insufficiency of the evidence on Count Three (hostage-taking of person believed to be Emilio's mother); (9) and jury tampering.  Gomez did not, in either of his pro se briefs, raise a claim of ineffective assistance of trial counsel.

5

In light of the Anders brief, the Second Circuit granted appellate counsel's motion to be relieved and further granted the government's motion for summary affirmance. United States v. Gomez, No. 96-1611 (Aug. 6, 1998) (summary order).

DISCUSSION

In a lengthy, blunderbuss-type motion that rails against both his trial and appellate lawyers, Gomez admits almost all of what the government proved at trial. Specifically, he states that,

--   he was "one of the collectors" responsible for the safekeeping of the $350,000 in money orders at the stash house;

--   Osorio, Emilio and Jerry robbed the money orders from the stash house, pistol-whipping two women who resided there;

--   Gomez suspected that the robbery was an "inside job;"

--   Having been given a description of the thieves, Gomez (and two other drug dealers from Tennessee) summoned Osorio to meet with them;

--   when Osorio denied the theft, Gomez decided to have the two beaten women look at him;

--   the women identified Osorio as one of the robbers; and

--   after that identification, Gomez and five other men were in an apartment with Osorio, who had already been beaten but was not yet dead and was not free to leave.

(Memo at 4-5.)[2]

Gomez admits all of that, and then he further admits going to the apartment "[o]n or about July 18, 1995," where he "found Papitas [i.e., Osorio] had been strangled." (Id. at 6.)

--------

[2]   "Memo" refers to Gomez's 94-page pro se memorandum in support of his petition. "R. Memo" refers to Gomez's Reply Memorandum dated May 28, 2000. "Gomez Aff." refers to the Affidavit of Gomez appended to the Reply Memorandum.

The only part of the government's case that Gomez does not admit in his petition was proved overwhelmingly at trial. On tape, Gomez told Barona that Osorio was treated well at first, but then he was tortured. He also told Barona that, upon being tortured, Osorio gave up Emilio and Jerry, so Emilio's mother had been kidnapped in Colombia. Also on tape, Gomez said he would accept cocaine in lieu of the stolen money orders, and that five kilograms would be an acceptable down payment.[3]

Also, Londono, who Gomez admits was part of the conspiracy to retrieve the stolen money, testified that Gomez hired him to kidnap Emilio and Jerry. Gomez also told Londono that Osorio had been kidnapped, tortured and killed by asphyxiation.

In short, very few cases entail evidence of guilt as strong as the evidence of Gomez's guilt in this case. With that backdrop, I turn to his various and belated allegations of incompetence by his lawyers.

A.      The Governing Standard

The Supreme Court has established the following standard for ineffective assistance claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable.

Strickland v. Washington, 466 U.S. 668, 687 (1984). Thus, to make out this type of claim, the

---

[3]      In his motion, Gomez admits the drug trafficking as well, saying that he turned the negotiations over to Londono because Gomez had only a "little interest" in the cocaine. (Memo at 6.)

petitioner must demonstrate both (1) that his attorney's performance "fell below an objective

standard of reasonableness," id. at 688, and (2) that "there is a reasonable probability that, but for

counsel's unprofessional errors, the result of the proceeding would have been different," id. at

694. In assessing the reasonableness of counsel's performance, "judicial scrutiny of counsel's

performance must be highly deferential," and the court must "indulge a strong presumption that

counsel's conduct falls within the wide range of reasonable professional assistance; that is, the

defendant must overcome the presumption that, under the circumstances, the challenged action

might be considered sound trial strategy." Strickland, 466 U.S. at 689 (internal quotation marks

omitted); Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998); see also Yarborough v. Gentry,

124 S. Ct. 1, 4 (2003) (per curiam) ("[C]ounsel has wide latitude in deciding how best to

represent a client . . . .").

      In assessing counsel's performance, I "must conduct an objective review . . .

measured for 'reasonableness under prevailing professional norms,' which includes a context-

dependent consideration of the challenged conduct as seen 'from counsel's perspective at the

time.'" Wiggins v. Smith, 123 S. Ct. 2527, 2535 (2003) (citations omitted) (quoting Strickland,

466 U.S. at 688-89)). The Supreme Court has "declined to articulate specific guidelines for

appropriate attorney conduct" and has instead emphasized that "'the proper measure of attorney

performance remains simply reasonableness under prevailing professional norms.'" Id. at 2535

(quoting Strickland, 466 U.S. at 688).

      To establish the requisite effect of counsel's performance on the outcome of the

proceeding, it is not sufficient if the petitioner shows merely that counsel's errors had "some

conceivable effect" on the outcome. Strickland, 466 U.S. at 693. Rather, there must be "a

reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding

would have been different." Id. at 694. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." Id. This determination, unlike the determination whether counsel's performance fell below an objective standard of reasonableness, may be made with the benefit of hindsight. See Lockhart v. Fretwell, 506 U.S. 364, 372 (1993).

B.      Gomez's Claims

        Most of Gomez's arguments reveal a misapprehension of the Sixth Amendment guarantee of effective assistance of counsel. For example, he criticizes counsel because counsel was still working on a defense strategy three weeks before the trial was to begin, and because some witnesses who counsel cross-examined managed "to skate away without fully answering" the questions. (R. Memo at 9-10.) These hindsight-aided criticisms, and numerous others leveled by Gomez, simply do not come close to alleging constitutional inadequacies in his representation. In any event, I address his various categories of claims below.

        1.      Failure to Investigate

        Gomez contends his trial counsel failed to conduct an adequate and thorough investigation of possible defenses. He claims that such an investigation should have included discovering "Gomez's actual whereabouts during the time of Mr. Osorio's death," an "independent voice analysis" of the tapes introduced at trial, and hiring an "expert . . . to prepare a social history evaluation." (Memo at 14.) This claim is baseless. Gomez does not specify what an investigation into his whereabouts at the time of Osorio's death would have uncovered. Indeed, even in his petition, he admits being present in the apartment where Osorio was murdered. Specifically, Gomez asserts he was there with five other men after Osorio was beaten but before he died (Memo at 5), and again on July 18, 1995, when Osorio's dead body was present in the apartment, (id. at 6). Apparently, Gomez claims to have been conveniently absent at the precise moment Osorio was

murdered, but he gives no clue as to where he was, or why he did not simply tell his attorney where he was. Finally, the government reports that in a proffer session prior to trial, Gomez admitted he was present when Osorio was tortured and murdered. Thus, an investigation by counsel into his "whereabouts" would not have produced a possible defense.

As for the "independent voice analysis," Gomez admitted upon arrest that he was "Gandhi," the name used on the tapes, and three witnesses identified his voice. Indeed, even on this motion, he admits that he was the person on the telephone who turned the cocaine negotiations over to Londono. (Memo at 6 ("Gomez had little interest in the cocaine and handed the negotiations over to . . . Londono").) Finally, Gomez's claim that trial counsel was ineffective for not hiring an expert to do a social history evaluation might make sense if this had been a capital case. I cannot conceive of how such an evaluation would have helped here, and Gomez does not explain how it could have.

2.      Inadequate Preparation for Cross-Examination

Gomez contends that trial counsel was inadequately prepared for trial because he "had no theory of defense" and "was woefully unprepared for effective cross-examination." (Memo at 14.) As for the first claim, Gomez further contends that "the theory of the defense should have been clear: Daniel Gomez is not the man called 'Gandhi.'" (Id. at 15.) If Gomez means that the defense should have been he was not *a* man known as Gandhi, his claim has no merit. In light of the overwhelming evidence at trial (including Gomez's admission)[4] that Gomez was called

---

[4]      Londono testified that he knew the defendant as "Gandhi" and made an in-court identification of the defendant as "Gandhi." Detective Ralat testified that in a post-arrest statement, the defendant admitted that his nickname was "Gandhi." Henry Roa, a car mechanic who knew the defendant from selling him cars and fixing his cars, identified him as "Gandhi." Finally, the defendant's own (common law) wife testified that in a post-arrest telephone call with her husband, she called him "Gandhi."

"Gandhi," it was reasonable for trial counsel to concede that his client was called "Gandhi" and instead contend that it had to be a *different* "Gandhi" who committed these crimes and was captured on the tapes. In light of the government's evidence, a defense that Gomez is not a man called "Gandhi" would have been unwise indeed. Trial counsel's defense strategy that a different "Gandhi" was on the tapes was therefore reasonable.

Gomez contends further that trial counsel's failure to interview witnesses led to ineffective cross-examinations of Barona, Londono, Detective Ralat, Henry Roa, and Special Agent Brian Chambers. Though counsel did not interview any of these witnesses pre-trial, it was neither unusual nor unreasonable for him not to do so. Indeed, with the exception of Roa, it is very unlikely that any of them would have agreed to speak to counsel or his investigator. Moreover, Gomez fails to specify the impeaching material that pre-trial interviews would allegedly have revealed.[5]

In any event, the record demonstrates that defense counsel attempted to impeach these witnesses in vigorous and thorough cross-examinations. "Decisions whether to engage in cross-examination, and if so to what extent and in what manner, are [ ] strategic in nature." United States v. Nersesian, 824 F.2d 1294, 1321 (2d Cir. 1987); see also United States v. Eisen, 974 F.2d 246, 265 (2d Cir. 1992) (where trial counsel subjected witnesses to vigorous cross-examination, "counsel could have reasonably concluded that further cross-examination on relatively unimportant matters would have confused or fatigued the jury.").

a.   Barona

Barona contacted the authorities after Emilio and Jerry advised him that Osorio had

---

[5]      Gomez belittles trial counsel's commencement of several cross-examinations by establishing that he and the witness had never met. (Memo at 17-18.) However, that tactic is quite common.

been kidnapped and that they were being threatened. Under Detective Ralat's supervision, Barona placed several taped telephone calls to Gomez and his co-conspirators. During those calls, Gomez (using the names Jose and Gandhi) stated that $350,000 in money orders had been stolen from him, that Osorio had been kidnapped and tortured, that Osorio had implicated Emilio and Jerry in the theft of the money orders, and that a woman believed to be Emilio's mother was kidnapped in Colombia.

Since Barona did not identify Gomez as Gandhi, no cross-examination was required to further the defense that Gomez was not the Gandhi on the tapes. Nevertheless, trial counsel conducted a thorough cross-examination of Barona, impeaching him by eliciting, for example, that he had lied under oath during a state plea allocution and had an extensive criminal background, including drug dealing, stash house robberies, and drug use.

Gomez contends that trial counsel did not expand on a number of insignificant issues, such as how Barona was able to get marijuana in jail and the source country for Barona's cocaine. Gomez does not say what the answers to these and other unasked questions would have been, or how they would have affected the outcome of the case. Moreover, some of these allegedly unexplored areas had in fact been covered, such as the full extent of Barona's drug use. (See, e.g., Tr. at 241, 502-03). Similarly, Barona fully explained why he was cooperating for the benefit of a third party. (See Tr. at 258, 535 (Third party had helped Barona in jail by putting money in his commissary and had offered to pay for an operation for Barona's son).)

b.   Londono

Trial counsel conducted a thorough cross-examination of Londono. It covered Londono's cooperation agreement and other motives for testifying, his history of violence, and numerous specific crimes Londono had committed, including kidnappings, extortions, and theft.

12

Gomez contends that counsel's cross-examination was inadequate because he: (1) did not further question Londono about Pacho Herrera;[6] (2) did not ask Londono if he committed a homicide; (3) exhibited signs he was not in control of himself; and (4) had not prepared transcripts of calls Londono made to his mother and brother from prison.

It was not unreasonable for trial counsel to stop asking questions about Herrera after Londono said he did not know Herrera. (See Tr. at 729.) Nor was it unreasonable for counsel not to question Londono about an alleged homicide after the government represented at a side-bar that the witness would deny any participation in the homicide and I indicated that I would instruct the jury that an attorney's questions are not evidence. (See Tr. at 717-18.) The claim that trial counsel was not in control of himself is based entirely on a common sidebar request that counsel keep his voice down so the jury would not hear him. Finally, Gomez does not demonstrate that transcription of the prison tapes would have in any way aided the cross-examination of Londono. The tapes were played for Londono and he admitted their contents.

c.    Roa

Roa, a car mechanic, identified Gomez as "Gandhi" and his girlfriend as "India." Roa had sold Gomez a number of cars, and had repaired cars for him. Gomez does not specify what additional questions should have been asked on the cross-examination of Roa. He simply criticizes trial counsel for failing to impeach the identification of Gomez as Gandhi. Since the witness had extensive dealings with the defendant and knew him as Gandhi, there was no effective way to impeach Roa on that subject.

d.    Ralat

---

[6]    Herrera was the third party for whose benefit Barona was cooperating.

13

Gomez alleges that the cross-examination of Ralat was ineffective because he was not asked about the methodology of taking the voice exemplar, and the exemplar was not played in court. However, hearing the tapes might well have enabled the jury to compare for itself the voices. This is precisely the sort of strategy that may not be second-guessed under the guise of assessing the effectiveness of trial counsel.

      e.    <u>Agent Chambers</u>

Chambers, part of the arrest team in Tennessee, seized two pieces of paper from the defendants in that case on July 17, 1995. Written on those pieces of paper were the name "Gandhi" and the same pager number that Detective Ralat and Barona used to contact the kidnappers in New York.

Gomez criticizes trial counsel's cross-examination of Chambers because (a) at one point counsel inadvertently referred to Tennessee as Louisiana and (b) at a side-bar, counsel mistakenly stated that the beeper number on the two pieces of paper belonged to Osorio, not Gomez. Those types of errors are too common and too innocuous to warrant habeas relief, however.

Gomez also claims that counsel should have elicited from Chambers testimony concerning "'Runi' and his relationship to the kidnaping and murder of Mr. Osorio." (Memo at 36.) He does not specify what admissible (<u>i.e.</u>, non-hearsay) testimony the Tennessee agent could have offered about Runi's participation in the murder of Osorio in New York. In any event, Londono had already testified that, according to Gomez, Runi participated in the murder of Osorio. Moreover, Runi and Gomez were linked to each other through, <u>inter alia</u>, the Tennessee wiretap calls, the Barona consensual calls, the Gandhi pager number found in Runi's possession in Tennessee, and Gomez's post-arrest statement.

14

3.    Inadequate Consultation

Gomez contends that his defense counsel met with him only 12 times before trial

commenced.  Assuming *arguendo* that to be true, Gomez nonetheless fails to explain how or why

further consultation would have assisted the defense.  Gomez concedes that the pretrial

consultations produced a trial strategy, i.e., to discredit Londono, and that the pretrial conferences

covered the Title III surveillance; the Barona tapes; a plea offer from the government; the terms of

Barona's and Londono's cooperation; and jury selection.  Even accepting as true Gomez's

description of trial counsel's consultations with him, the first Strickland requirement has not been

met.

4.    Conduct During Voir Dire

Gomez contends that trial counsel provided ineffective assistance by failing to

challenge Juror Saez because she worked at the World Trade Center and, in light of the 1993

bombing there, she could not be unbiased.  It was ineffective assistance not to challenge Juror

Studifin, Gomez argues, because her son was a police officer.  These claims are simply frivolous.

I also note that it is apparent from the trial record that Gomez himself was involved, according to

counsel, in the peremptory challenges.  (See, e.g., Tr. at 81-82).

5.    Gomez's Right to Testify

Gomez claims that he wanted to testify at trial but trial counsel would not let him.

A hearing will be held on this issue on April 9, 2004 at 11:00 a.m.

6.    Performance During Trial

To the extent that this argument does not rehash Gomez's other complaints about

trial counsel, it merely second guesses minor decisions at trial or criticizes minor, routine errors

by counsel.  For example, Gomez complains that trial counsel failed to appear on the first day of

15

trial because he was sick. Although I issued an order to show cause why counsel should not pay the cost of unnecessarily bringing in a jury panel that day, no sanction was imposed, and the short-lived possibility of such a sanction was collateral to the trial and had no impact on the outcome of the case.

Gomez criticizes trial counsel for believing I had denied, rather than reserved judgment on, the government's motion to preclude cross-examination of Barona regarding an incident that occurred in Colombia. Such confusion is common, and here it had no bearing on my final ruling on that motion, much less on the outcome of the case.

Gomez complains that trial counsel had indicated that he might want to elicit testimony from Londono about a conversation Londono had in jail with Gomez, during which Gomez told Londono that another attorney had claimed he would bribe the prosecutor. Since I precluded that line of inquiry, the jury never learned of it, and no harm was caused. Gomez correctly contends that trial counsel did not interview Gomez's common law wife prior to her testimony, but he fails to establish what such an interview would have revealed or how it would have helped the defense. Similarly, that trial counsel made objections that were overruled does not indicate a lack of preparation. Indeed, most of the government's objections were overruled as well, and no one can dispute the fact that the government was extremely well prepared for trial.

7.    Inadequate Summation

Gomez attacks his trial counsel's summation for several reasons. Chief among them is the admission that Gomez was called Gandhi. As discussed above, in light of the overwhelming evidence of that fact, this was reasonable. In his summation, trial counsel attacked the government for not offering more proof relating to the kidnapping of a woman believed to be Emilio's mother. Gomez contends that this argument reflects ineffectiveness because counsel had

not established Emilio's mother's last name. Implicit in Gomez's argument is that knowing the last name would have enabled counsel to prove that Emilio's mother had not been kidnapped. When Gomez raised this same argument at sentencing, I rejected it on the ground that the government's theory throughout the case had been that a woman *believed to be* Emilio's mother (and not actually Emilio's mother) had been kidnapped. Thus, Emilio's mother's last name was not relevant.

Gomez also claims that trial counsel spoke in "improper English" and "gibberish." This claim is ridiculous. Trial counsel spoke just fine, and the court reporters' mistranscriptions of the fast-spoken closing arguments (of both counsel) do not alter that fact.

In sum, Gomez's criticisms of his attorney's summation are unfounded. In light of the strength of the government's case, counsel had a difficult job in summation. Nevertheless, he vigorously attacked the credibility of government's main witnesses, Barona and Londono, and attempted to discredit the voice identifications as well. Finally, counsel carefully focused on the individual elements that, he argued, had not been proven beyond a reasonable doubt. (See Tr. at 993-1017.) The summation did not fall below an objectively reasonable standard of performance for defense counsel.

8.    The Plea Offer

Gomez contends that he received ineffective assistance of counsel in the form of poor advice with respect to an alleged plea offer of 15-20 years. According to Gomez, the offer relayed to him was conditional on his cooperation. Also, Gomez asserts that he was told by trial counsel that he would be sentenced to 25 years in prison if he went to trial and was convicted. (R. Memo at 2-3.) Although neither of the prosecutors recalls making such a plea offer, I assume for present purposes that it was made. The prosecutors report that trial counsel would say, if called as a witness, that he: (1) recalls a plea offer of 20 years having been made; (2) conveyed that offer

17

to his client and laid out the options for him; and (3) did not (contrary to the claim in Gomez's motion) advise Gomez that he faced only 25 years if convicted after trial.

Defense counsel "must give the client the benefit of counsel's professional advice on [the] crucial decision of whether to plead guilty." Purdy v. United States, 208 F.3d 41, 44 (2d Cir. 2000) (citation and quotations omitted). In rendering this advice, "counsel must communicate to the defendant the terms of the plea offer, and should usually inform the defendant of the strengths and weaknesses of the case against him, as well as the alternative sentences to which he will most likely be exposed." Id. at 45 (citations omitted). "On the other hand, the ultimate decision whether to plead guilty must be made by the defendant. And a lawyer must take care not to coerce a client into either accepting or rejecting a plea offer." Id.

Even as relayed by Gomez, trial counsel's conduct with regard to the plea offer was largely unobjectionable on Sixth Amendment grounds. Counsel conveyed the plea bargain to Gomez and, given counsel's assessment of Londono as a witness, advised Gomez against accepting the offer. Counsel did state his view that he did not like "snitches," and did not like entering into cooperation agreements with the government. On the other hand, counsel did not exclude the possibility. Cf. United States v. Gonzalez-Bello, 10 F. Supp. 2d 232, 241-42 (E.D.N.Y. 1998) (downward departure based on, inter alia, counsel's obstruction of defendant's effort to cooperate). Moreover, Gomez himself says that he told his trial counsel that he "didn't want to be a snitch," and further that he did not want to plead guilty and do 15-20 years "for something he had actually not done." (R. Memo 2-3.) Finally, counsel advised Gomez about the strength of the government's case. In addition to the assessment of Londono's credibility, Gomez relates in his reply brief that counsel advised him that a guilty plea might be the wiser course if the government called the Tennessee drug dealers as witnesses at trial. (Id.) Thus, there was nothing

defective about any of this advice.

The only arguably ineffective aspect of trial counsel's conduct in this regard relates to the sentence Gomez would face if convicted at trial. According to Gomez, counsel said Gomez "would be faced with 25 years" in that event. (Gomez Aff. ¶ 7.) Such advice, if given, was incorrect, and given Gomez's age (28 years old at the time of conviction), it would have been a material error.

It is not clear to me that any such error, if made, had an effect on the outcome of the proceeding. Gomez's claim of "actual innocence" (Memo at 93), together with his assertion that he did not want to plead guilty because "15 to 20 years . . . is a lot of time for something I had actually not done" (Gomez Aff. ¶ 6), suggest that he would not have pled guilty even had he known he would face life in prison if convicted.

However, because a hearing will be held with respect to Gomez's claim that counsel would not permit him to testify, I will hear testimony on this issue (i.e., whether Gomez was advised that he only faced 25 years if convicted at trial) as well.

9.     The Withdrawal of the Suppression Motion

Trial counsel had initially moved to suppress Gomez's post-arrest statement, but then withdrew that motion at a pre-trial conference. In light of Detective Ralat's trial testimony that the statement was given voluntarily and after Gomez was advised of his <u>Miranda</u> rights and signed a written waiver of rights form, a motion to suppress the post-arrest statement would have failed. The decision not to pursue a meritless motion does not constitute ineffective assistance of counsel.

10.     The "Jury Tampering" Issue

Osorio's brother, Diego Guerrero, who speaks only Spanish, inadvertently

19

wandered into the jury room on the first day of trial, thinking it was the witness room.[7]  No one on

the jury spoke Spanish, and no conversation with the jurors occurred.  Gomez contends that trial

counsel did not adequately represent him in connection with this event.  In fact, counsel ably and

zealously represented Gomez on this issue.  He moved for a mistrial and requested additional

questioning of the jurors even after a voir dire made clear that the incident would not prevent the

jurors from being fair and impartial.  Counsel raised the issue again in post-trial motions.  Indeed,

he could scarcely have been more vigorous in Gomez's defense.

    11.    The Pretrial Motions

        Gomez contends that trial counsel was ineffective because he failed to file a motion

to dismiss the indictment on speedy trial grounds or a motion to recuse me.  A motion to dismiss on

speedy trial grounds would have been fruitless.  Virtually no time expired on the speedy trial

clock.  Gomez was indicted on October 23, 1995.  On November 1, 1995, he appeared in court for

the first time.  The time from November 1 through December 8, 1995 was excluded (see docket

entries 27 and 29 for docket no. 95-CR-750 (JG)) and on December 8 the case was designated as

complex, (see id. docket entry 32).  Trial began less than six months later.  Thus, counsel's

decision not to file a speedy trial motion was a good one.

        A recusal motion in this case would also have failed.  Gomez claims that I

harbored actual prejudice against trial counsel or Gomez himself because trial counsel's illness

delayed the trial by a week.  Specifically, on the morning jury selection was scheduled to

commence, trial counsel left a message on my case manager's answering machine, stating that he

---

[7]    The accommodations on the ground floor of the courthouse annex where the trial occurred,
which has since been destroyed to make room for a new courthouse, unfortunately were easily susceptible of such
a mistake.

was sick and would not be coming to court that day. I am confident that a reasonably objective observer would not have questioned my impartiality simply because I required trial counsel to substantiate the last-minute claim of illness that required a very large panel of prospective jurors to be sent home. Trial counsel was not ineffective for failing to file a meritless motion.

12.   The Sentencing

Gomez contends that trial counsel was ineffective at the sentencing. None of his claims has any merit. Moreover, because Gomez faced a mandatory sentence of life imprisonment on Count Two, see 18 U.S.C. § 1203, alleged deficiencies in representation cannot have prejudiced him in any way.

13.   Ineffective Assistance of Appellate Counsel

Although the Supreme Court formulated the Strickland test in the context of examining a claim of ineffective assistance of trial counsel, the same test applies to claims regarding the performance of appellate counsel. See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); Claudio v. Scully, 982 F.2d 798, 803 (2d Cir. 1992). Appellate counsel need not present every nonfrivolous argument that could be made. See Mayo, 13 F.3d at 533; see also Evitts v. Lucey, 469 U.S. 387, 394 (1985) (emphasizing that appellate counsel "need not advance every argument, regardless of merit, urged by the appellant"). Moreover, reviewing courts should not employ hindsight to second-guess an appellate attorney's strategy choices. See Mayo, 13 F.3d at 533. A habeas petitioner, however, may establish constitutionally inadequate performance if he shows that his appellate counsel omitted material and obvious issues while pursuing matters that were patently and significantly weaker. Cf. Jackson v. Leonardo, 162 F.3d 81, 85 (2d Cir. 1998) ("[R]elief may be warranted when a decision by counsel cannot be justified as a result of some kind of plausible trial strategy.").

Gomez claims appellate counsel was ineffective because he filed an <u>Anders</u> brief without consulting with him and failed to notify Gomez of his right to file a <u>pro se</u> brief. Although appellate counsel concededly did not consult with Gomez, he did notify him of his right to file a <u>pro se</u> brief. (<u>See</u> Ex. 1 to Gov't Opp. Br.)

Although appellate counsel should have consulted with Gomez, his failure to do so was not a <u>per se</u> violation of Gomez's Sixth Amendment rights. <u>Grey v. Henderson</u>, 788 F. Supp. 683, 691 (E.D.N.Y. 1991) (citing <u>United States ex rel. Russo v. Attorney General of Illinois</u>, 780 F.2d 712 (7th Cir. 1986) ("although it is 'highly desirable,' it is not constitutionally required that counsel consult with the petitioner prior to the filing of his motion to withdraw under <u>Anders</u>.")). In this case, Gomez has failed to demonstrate how the lack of consultation rendered appellate counsel's assistance ineffective, or how it had any bearing on the outcome of the appeal. The <u>pro se</u> appellate briefs filed by Gomez shed some light on the issues Gomez would have raised with appellate counsel had they consulted: prosecutorial misconduct in the government's rebuttal summation; improper testimony from Barona regarding taped conversations; outrageous government conduct in creating a crime; insufficiency of the evidence on Count Three (hostage-taking of a person believed to be Emilio's mother); and jury tampering. I have reviewed those claims, and I have no doubt that appellate counsel would have correctly concluded that they lacked merit. Thus, the failure to consult did not prejudice Gomez.

## CONCLUSION

For the foregoing reasons, all of Gomez's challenges to his conviction are rejected, with two exceptions, as to which I reserve judgment and will conduct an evidentiary hearing on April 9, 2004 at 11:00 a.m. Those challenges are: (1) that trial counsel refused to permit Gomez to testify; and (2) that trial counsel misinformed Gomez of the maximum sentence he would face if

convicted.

So Ordered.

John Gleeson, U.S.D.J.

Dated: March 22, 2004
       Brooklyn, New York